Filed 3/14/13  Roepel v. Pacific Specialty Ins. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| KERRI ROEPEL et al., <br><br> Plaintiffs, Cross-defendants and Appellants, <br><br><br> v. <br><br> PACIFIC SPECIALTY INSURANCE COMPANY, <br><br> Defendant, Cross-complainant and Respondent. | B230306 <br><br> (Los Angeles County <br> Super. Ct. No. BC368157) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Maureen Duffy-Lewis, Judge.  Affirmed.

Brentwood Legal Services and Steven L. Zelig for Plaintiffs, Cross-defendants and Appellants.

Shoecraft Burton, Robert D. Shoecraft and Michelle Kelli Burton for Defendant, Cross-complainant and Respondent.

\* \* \* \* \* \* \* \*

This case arises from the ashes of two separate fires that occurred on February 12, 2005, at the Leona Valley property owned by Kerri Roepel and Roepel's then-husband, Howard Breuer. Their residence, which at the time was under construction from a January 2002 fire, was completely destroyed. A detached quonset hut, located approximately 50 feet from the residence, was also destroyed. Roepel claimed to have lost several hundred thousand dollars in personal property stored in the hut. Roepel timely submitted her claim to her insurer, Pacific Specialty Insurance Company (PSIC). Approximately 20 months later, PSIC denied Roepel's claim and rescinded her policy based on numerous material misrepresentations contained in her application for insurance.

The jury concurred, finding Roepel misrepresented material facts on her application for insurance entitling PSIC to rescind its policy. The jury also found Freeway Insurance Services, Inc. (Freeway) was Roepel's broker, not PSIC's agent. Judgment was entered for PSIC and against Roepel on November 18, 2010. Notice of appeal was timely filed by appellants Roepel and her children, Ryan, Jesse, Kathryne and Madison Roepel (the Children).

Appellants argue there was insufficient evidence to support the jury's findings, evidentiary rulings by the trial court undermined appellants' case, and the special verdict was unduly biased against appellants. Appellants also argue the trial court erred by sustaining PSIC's demurrer without leave to amend, by granting a directed verdict for PSIC as to punitive damages and by granting a nonsuit as to Roepel's children. We agree with PSIC that substantial evidence supports the jury's verdict. In addition, we find all other claims of error lack merit. Accordingly, the judgment is affirmed in its entirety.

## FACTS AND PROCEDURAL BACKGROUND

### 1. *The Leona Valley Residence and the January 2002 Fire*

Kerri and James Roepel (the Roepels) married in July 1987. The Roepels purchased the Leona Valley residence from James's parents in 2001. In January 2002, the home suffered extensive fire damage. The house was uninhabitable.

2

The Roepels submitted claims to Allstate Insurance Company (Allstate) for damage to the dwelling, another structure, loss of personal property and additional living expenses. Allstate and the Roepels settled as to the dwelling damage for $308,500, with $60,000 withheld by Allstate pending completion of 70 percent of the repairs. The Roepels submitted a sworn statement in proof of loss claiming $289,360 as the value of their damaged personal property. Allstate denied their personal property claim because of a conflict between the statements given by the Roepels.

In February 2002, the Roepels entered into a $300,000 burn restoration contract with Eagle Construction. Work, however, stopped sometime between March and June 2003, the result of the Roepels' divorce and problems with Eagle Construction. On November 6, 2003, the Los Angeles County Fire Department issued a stop work order for lack of a fire suppression system, water and access.

The Roepels also submitted a claim to Allstate for a September 2002 brush fire at the location. Allstate paid on this claim, although at trial, Roepel could not recall the amount. Thereafter, Allstate ceased to insure the Leona Valley property, and the lender placed a forced insurance policy that covered only the lender's interest. The forced policy did not cover personal property or other structures, such as the quonset hut.

## 2. *The Roepels' Divorce*

After the 2002 fires, the Roepels separated and Roepel began dating Howard Breuer. In August 2003, Roepel and Breuer moved in together, renting a home in Granada Hills. The Roepels' divorce was finalized in September 2004, and Roepel was awarded the Leona Valley property in lieu of support and other obligations.

In October 2004, Breuer became a co-owner of the Leona Valley property. His name was put on title to obtain a loan to finish construction at the property. The loan was initially for $95,000, but increased to $143,000. Neither Roepel nor Breuer kept a ledger detailing loan proceeds spent on construction.

3

In October 2004, Roepel and Breuer listed the Leona Valley property for sale. The listing agreement stated: "Listing not to be submitted to the MLS systems until construction is further complete in the Spring of 2005."

To avoid the forced policy on the residence, Roepel randomly called several insurance companies to obtain coverage. She was unsuccessful, either because the residence was still under construction or because the property was in a high fire zone. On January 18, 2005, Roepel again sought homeowners insurance, this time through Freeway. Roepel did not contact Freeway to obtain insurance specifically from PSIC. Rather, Roepel was interested in "all the insurances [Freeway] offered."

### 3. *Roepel's Application for Insurance With PSIC*

Roepel spoke to Freeway's employee, Audrey Lopez. Roepel inquired as to the types of insurance Freeway offered. In response, Lopez faxed Roepel a document entitled, "Appointment of Insurance Broker," which Roepel signed. Roepel handwrote she "read and [understood]" the document, which identifies Freeway as Roepel's broker and states Freeway will represent her in obtaining coverage.

Lopez then telephonically assisted Roepel in completing the insurance application. Roepel provided Lopez with her name and the address of the Leona Valley property for the application. Lopez then faxed the prefilled application to Roepel; several questions were left blank and were circled for Roepel to answer. The application states: "I have reviewed the above information and warrant that the application is true and correct." Roepel completed the application, signed it on January 18, 2005, then returned it to Lopez.

On the application, Roepel's name was misspelled. Roepel testified she did not notice. Roepel also identified Breuer as her husband, though they had not yet married; Roepel married Breuer 10 days later, on January 28, 2005. The application also had an incorrect zip code for the Leona Valley property.

Freeway submitted the completed and signed application to PSIC on January 24, 2005. PSIC bound the policy, effective January 18, 2005, per Roepel's request. On

4

January 25, 2005, PSIC ordered an exterior inspection of the property. The Leona Valley property, however, is located in a rural area. The road leading to the location was inaccessible from weather damage. PSIC's inspector either could not locate the property or was unable to obtain access to it.

PSIC ran a Comprehensive Loss Underwriting Exchange (CLUE) report on Roepel. The report disclosed Roepel had submitted (1) a theft claim to Allstate on May 17, 2001, (2) a fire claim on January 9, 2002, and (3) a fire claim on September 3, 2002. On January 26, 2005, to verify the accuracy of the CLUE report, PSIC sent a letter to Roepel and Freeway requesting further information about the previous fires. Neither Roepel nor Freeway responded to this letter.

### 4. *The February 12, 2005 Fires*

Sometime after midnight, on February 12, 2005 -- 18 days after PSIC received Roepel's application -- two separate fires struck the Leona Valley property, one at the house, the other at the quonset hut. Detective Larry Lewis, Los Angeles County Sheriff's Arson Explosives Detail, noted the house had been reduced to a "pile of coal in [the] basement." He concluded there were two separate fires, both arson. Lewis spoke to Roepel at the scene. He suspected Roepel was involved in the fires based on her demeanor, inconsistencies between her statements and facts he observed, and information he obtained from the building department regarding her problems with construction permits. Lewis was subsequently unable to obtain a sit-down interview with Roepel to discuss her inconsistencies.

PSIC's fire investigator, Thomas Pierce, similarly concluded there were no accidental ignition sources associated with these fires. Due to the remote location and difficult access, Pierce concluded the fires were probably set by someone familiar with the property. In his opinion, the fires were arson.

According to PSIC, Roepel's claim had numerous red flags, indicating potential fraud, including multiple points of origin, the property was vacant and for sale, the fires occurred after 11:00 p.m., the fires occurred within 30 days of the inception of coverage,

5

and Roepel's application appeared to contain misrepresentations. Additionally, the quonset hut fire debris was inconsistent with Roepel's statement that a refrigerator or freezer had been inside the hut. As such, PSIC did not pay on Roepel's claim, but instead referred the matter to its Special Investigations Unit for review.

In or around July 2005, Roepel hired Mike Vaughan, a public adjuster, to safeguard her rights. Sometime thereafter, Vaughan suggested she also hire a lawyer, which she did.

**5. *The Four Questions***

While PSIC suspected Roepel had caused the two February 2005 fires, PSIC ultimately concluded it was unable to prove as such. During its investigation, though, PSIC learned from Breuer that the house was uninhabitable due to the January 2002 fire. This led PSIC to question the veracity of the information in Roepel's application. PSIC focused on four questions.

*Question No. 3: Will you occupy the dwelling as your only primary residence within 10 days of inception of the policy? If no, prohibited.*

Roepel answered this question "yes," even though (1) Roepel was at the time living with Breuer and their children in a rented house in Granada Hills, and (2) their lease required 30 days written notice to vacate, which had not been given to their landlord. Additionally, Breuer testified he never stayed overnight at the Leona Valley residence and Roepel told Pierce no one was living at the property at the time of the fires. The residence only had a temporary power pole and the county had not issued a certificate of occupancy permit.

*Question No. 14: Has insured reported any claim in the past three years? If yes, risk prohibited.*

Roepel answered this question "no," even though she submitted a claim to Allstate for a wild fire at the location in September 2002. In fact, Roepel received money from

6

Allstate for this claim, although at trial, she could not recall the amount.  While Roepel's earlier claim for the January 2002 fire fell days outside the three-year window, the September 2002 fire occurred within three years of her application.

*Question No. 16:  Has any damage remained unrepaired from previous claims and/or any pending claims and/or any known or potential (a) defects, (b) claim disputes, (c) property disputes and/or (d) lawsuits?  If yes, risk prohibited.*

*Question No. 22:  Does dwelling have any remodeling or construction performed without permit or ongoing extensive remodeling or renovation?  If yes, risk prohibited.*

Roepel answered "no" to the above two questions.  Correspondence from Roepel to Allstate, however, dated January 18, 2005 -- the same date the PSIC application was signed -- paints a different picture.  In the correspondence to Allstate, Roepel writes:

"As you are aware, we suffered fire damage . . . on Jan. 9, 2002.  You settled for $308,500 on or about April 24, 2002.  You paid a $248,367.74 installment to our lien holder, Washington Mutual, in mid-May 2002, and held back over $60,000 until we could reach 70 percent completion (drywall stage).  We are at that stage and we request that Allstate release the remainder of the money."

Further evidence the home was still under construction includes:  (1) there was a temporary power pole to provide electricity with a large gauge extension cord running in through a window, into the house; (2) the residential listing agreement stated "[l]isting not to be submitted to MLS systems until construction is further complete in the Spring of 2005 . . ."; and (3) photos submitted with the January 18, 2005 letter to Allstate show the unfinished interior of the residence, with open walls and visible insulation in certain areas, along with large stacks of unused drywall in the premises.

Unrelated to its investigation, PSIC cancelled Roepel's policy for nonpayment of premium on May 18, 2005.  Then, in October 2006, as the result of purportedly material misrepresentations, PSIC reinstated Roepel's policy and rescinded it.  Representatives from PSIC testified PSIC returned the unearned premiums and inspection fee, although whether the inspection fee was actually returned was contested at trial.

7

**6.      *Procedural History***

As noted, Roepel and her Children filed suit on March 19, 2007, alleging 10 causes of action against PSIC:  (1) breach of implied covenant of good faith and fair dealing; (2) breach of contract; (3) fraud in the performance of insurance contract; (4) negligent misrepresentation; (5) fraud in the inducement of the insurance contract; (6) negligent misrepresentation; (7) negligence; (8) breach of contract; (9) intentional infliction of emotional distress; and (10) reformation.  The complaint further alleges Freeway was the agent of PSIC.  Roepel and her children also sued Freeway, though they settled prior to trial.[1]

PSIC demurred to the third through seventh and ninth causes of action.  On December 13, 2007, the court sustained PSIC's demurrer without leave to amend.  PSIC then filed an answer to the remaining causes of action and a cross-complaint (which it abandoned as to the Children).  Jury trial commenced on July 1, 2010.  Deliberations began on August 4, 2010.  That same day, the jury reached a verdict.

The jury found Roepel misrepresented material facts on her application for insurance entitling PSIC to rescind its policy.  The jury also found Freeway was acting as Roepel's broker, not PSIC's agent.  Judgment was entered for PSIC on November 18, 2010.  Notice of appeal was timely filed by appellants.

Roepel argues there was insufficient evidence to support the jury's findings, evidentiary rulings by the trial court undermined her case, the special verdict prejudiced her, and the trial court erred by granting a directed verdict for PSIC as to punitive damages.  Roepel and her Children further argue the trial court erred by sustaining PSIC's demurrer without leave to amend, and her Children argue the trial court erred by granting a nonsuit against them.

---

[1]      Per appellants' reply brief, the claims of Plaintiffs Howard Breuer and Sara Breuer have been resolved and are no longer being pursued on appeal.

**DISCUSSION**

Trial in this matter spanned the better part of five weeks; trial transcripts cover 21 volumes and are nearly 6,000 pages in length. Appellants' appendix exceeds 2,800 pages. Appellants spend in excess of 40 pages in their opening brief recounting purportedly favorable testimony of each witness, along with countless rulings appellants deem erroneous, for the most part, without presenting any specific argument, citation to case law or statutory authority.

**I.      Substantial Evidence Supports the Jury's Findings**

The primary argument advanced by Roepel is that the evidence presented does not support the verdict. The substantial evidence standard governs this claim of evidentiary insufficiency. In assessing whether substantial evidence exists, we view the evidence in the light most favorable to the prevailing party and indulge in all legitimate and reasonable inferences to uphold the jury's verdict. (*Sanchez-Corea v. Bank of America* (1985) 38 Cal.3d 892, 907.) We do not evaluate the credibility of the witnesses but defer to the trier of fact (*Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968); nor do we reweigh the evidence. The testimony of a single witness may provide substantial evidence. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.) The judgment will be upheld if it is supported by substantial evidence, even though substantial evidence to the contrary also exists and the trier of fact might have reached a different result had it believed other evidence. (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631 (*Howard*).) We employ the substantial evidence rule no matter what the standard of proof at trial, whether a preponderance of the evidence, clear and convincing evidence or proof beyond a reasonable doubt. (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138; *Crail v. Blakely* (1973) 8 Cal.3d 744, 750; *In re Mark L.* (2001) 94 Cal.App.4th 573, 580-581.) Here, there is substantial evidence to support each challenged finding by the jury.

*A.      Freeway Was a Broker, Not an Agent*

Roepel's case hinged on the premise that (1) Freeway was PSIC's agent, and (2) Roepel disclosed the truth regarding all material facts to Freeway. Thus, Roepel

9

argues, even if Roepel's application contained material misstatements, the true and correct information is imputed to PSIC through its agent, Freeway. The jury did not agree, finding Freeway was acting as an insurance broker on behalf of Roepel, not as an agent of PSIC. There is substantial evidence to support this finding.

Immediately prior to submitting her application for insurance, Roepel signed a document entitled "Appointment of Insurance Broker," which identifies Freeway as her broker and states that Freeway will represent her in obtaining coverage. This document alone constitutes substantial evidence to affirm the jury's finding.

Additionally, and amongst other witnesses, Susan Valencia, a vice president and head of underwriting at McGraw Insurance Services, PSIC's parent, testified Freeway was a broker, not an agent of PSIC. Michael Miles, from PSIC Special Investigations Unit, testified PSIC does not use agents, only brokers, and Freeway was not PSIC's agent. Marlon Young, in-house counsel for PSIC, similarly testified Freeway was a broker, not an agent. Young added there had been no appointment by the Department of Insurance permitting Freeway to serve as PSIC's agent, as required by law. Kelly Turton, Freeway's then-President, testified Freeway was an insurance broker, placing insurance with as many as 40 to 50 carriers, including PSIC. Turton unequivocally stated that Freeway was a broker, not an agent.[2] Thus, we conclude substantial evidence

---

[2]    Roepel made extensive use of exhibits 165 and 166, to argue Freeway was an agent of PSIC. The jury was not convinced. The jury's finding is supported by substantial evidence. Exhibit 166 is the 1989 agreement Freeway entered into with PSIC allowing Freeway to submit applications for insurance to PSIC. It identifies Freeway as a broker. Exhibit 165 is the 1994 agreement between Freeway and PSIC, which remained in effect through 2005. It identifies Freeway as an agent.

PSIC's standard form agreement reads as follows: "Agreement between _____, a duly licensed California Agent □ Broker □ (hereafter called producer) . . . ." In 1994, Turton checked the box before the word "Broker," instead of the box after it, thereby signifying Freeway was PSIC's agent. At trial, Turton testified he checked the wrong box. Turton added he thought he had checked the box for broker and he meant to do so. Regardless, this document was only obtained during discovery and therefore, could not have been known to or otherwise relied upon by Roepel when she applied for insurance on January 18, 2005.

supports the jury's finding Freeway was acting as an insurance broker on behalf of Roepel and not as an agent of PSIC.

## B.    *PSIC Properly Rescinded Roepel's Policy*

In October 2006, PSIC rescinded Roepel's policy on the grounds (1) Roepel did not occupy the Leona Valley property as her primary residence within 10 days of the inception of coverage; (2) Roepel made a claim within the past three years; and (3) there was unrepaired damage to the Leona Valley residence. The jury agreed, finding PSIC properly rescinded Roepel's policy. We find the record contains substantial evidence to support the jury's finding.

## 1.    **Material Misrepresentations**

Roepel's application for insurance contained numerous material misrepresentations justifying rescission. To begin with, her name and address were incorrect on the application. Susan Valencia testified the accuracy of this information is important to PSIC because if a name is misspelled, it could prove difficult to identify the applicant and obtain a CLUE report on that person, whereas if the full address is incorrect, it could prove difficult to inspect the premises, as in this case. Valencia further testified PSIC relies on the accuracy of the application and any prohibited risk would automatically disqualify an applicant. Roepel answered each of the following four questions untruthfully:

> "Question No. 3: Will you occupy the dwelling as your only primary residence within 10 days of inception of the policy? If no, [risk] prohibited."

Roepel answered "yes," even though the Leona Valley home had a temporary power pole and was without a certificate of occupancy. Breuer testified that he never stayed overnight at the Leona Valley residence and Roepel told PSIC's fire investigator,

11

that no one was living at the property at the time of the fire.  Jesse Roepel, who was 16 years old at the time of the fire, testified as follows:

"Q:     Now you never lived at the Leona Valley property between the dates of January 18, 2005, and February 12, 2005, the day of the fire, right?

"A:     That's correct.

"Q:     And your brothers and sisters didn't live at the Leona Valley property between those two dates, right?

"A:     That's correct, no.

"Q:     And Howard Breuer didn't live at the Leona Valley property between those two dates, true?

"A:     Correct."

Jesse added that he was last at the Leona Valley property two to three months prior to the February 2005 fire.  Sarah Breuer testified she never slept at the Leona Valley residence.

Valencia testified the preferred HO3 Program Roepel applied for and obtained coverage under is available only to those who occupy their home as their primary residence.  Valencia added an insured under this policy cannot have two primary residences.  Valencia concluded that while Roepel may have qualified for a different program (DP1 or DP3), at a substantially higher premium, she would not have qualified for the HO3 Program had she answered this question truthfully.

"Question No. 14:  Has insured reported any claim in past three years?  If yes, risk prohibited."

Roepel answered "no," even though in September 2002, she submitted a claim to Allstate for a wild fire at the premises for which she received compensation.  Valencia testified PSIC would not have bound its policy if Roepel had answered this question truthfully.

"Question No. 16:  Has any damage remained unrepaired from previous claims and/or any pending claims and/or any known or potential (a) defects, (b) claim disputes, (c) property disputes and/or (d) lawsuits?  If yes, risk prohibited."

"Question No. 22:  Does dwelling have any remodeling or construction performed without permit or ongoing extensive remodeling or renovation?  If yes, risk prohibited."

Roepel answered "no" to the above two questions, even though on the same date she submitted her application, January 18, 2005, she wrote a letter to Allstate in which she represented the Leona Valley residence was 70 percent complete and was at the drywall stage.  Jesse Roepel testified when he was last at the residence before the fire, sometime in November or December 2004, the drywall had just barely been started, the stucco work had not been completed, the kitchen cabinets were not installed, he did not believe the kitchen sink had been installed, the walls just had particle board, the carpeting had yet to be installed and there were no toilets or bathroom sinks (other than in the basement).  He added he had not been told a move-in date.

Again, a temporary power pole provided electricity to the residence via a large gauge extension cord running in through a window into the house, and the county had not issued a certificate of occupancy permit.  The residential listing agreement stated: "Listing not to be submitted to MLS systems until construction is further complete in the Spring of 2005 . . . ."  Photos submitted with the January 18, 2005 letter to Allstate show the unfinished interior of the residence, with open walls and visible insulation in certain areas, along with large stacks of unused drywall in the premises.  Plus, in November 2003, the Los Angeles County Fire Department issued a stop work order, for lack of a fire suppression system, water and access.

Valencia testified "if [the application] says 'if yes, prohibited,' they answer 'yes,' we wouldn't have accepted the application.  We wouldn't have cashed the check or accepted payment, and we would return the application unbound to [Freeway] and letting [*sic*] them know why we are returning it unbound."  She added that the Roepel residence,

13

with prior unrepaired damage, was not in an insurable condition per the underwriting guidelines.

## 2.     Timeliness of Rescission and Waiver

The jury expressly found PSIC did not delay in providing Roepel with notice of rescission, PSIC returned or offered to return the insurance premiums paid on behalf of Roepel, and PSIC did not waive its right to rescind the insurance policy.  To the extent Roepel contends the jury erred as to these findings, we disagree.

At trial, neither side disputed the February 12, 2005 fires resulted from arson. Roepel suggested they may have been caused by her bitter ex-husband, James Roepel, or possibly by a disgruntled former contractor.  PSIC argued Roepel was responsible for the two fires.  The jury found in favor of Roepel (i.e., that someone else caused the two fires).  Regardless of who caused the two fires, it was reasonable for PSIC to fully investigate this claim and in fact, mandated by law.  (See Cal. Code Regs., tit. 10, § 2698.30 et seq.)  As such, substantial evidence supports the jury's finding PSIC did not delay because it took 20 months to investigate and deny a claim as complex as this one, especially when the record contained evidence Roepel, during the pendency of this claim, delayed sitting (for about nine months) for a recorded statement and later, an examination under oath.

Nonetheless, Roepel argues PSIC failed to comply with California Code of Regulations, title 10, section 2695.7, subdivision (b), by failing to accept or deny Roepel's claim, in whole or in part, within 40 calendar days from receiving proof of the claim.  However, section 2695.7, subdivision (c)(1) permits additional time to determine whether a claim should be accepted and/or denied in whole or in part, so long as written notice is provided to the claimant within the time frame specified in section 2695.7, subdivision (b) and every 30 days thereafter until a determination has been made, as occurred in this matter.  Section 2695.7, subdivision (h) is similarly unhelpful to Roepel, in that all amounts here "were reasonably in dispute."

14

**3.** **Instructional Error**

On page 74 of her opening brief, Roepel includes the following two sentences:

"Appellants requested that the Trial Court instruct the jury that whether there was a foreclosure should be disregarded.

"Likewise, Appellants requested that the trial court instruct the jury that whether repairs were actually performed was irrelevant to the issue of amounts due under an insurance policy."

Roepel fails to list these contentions under a separate heading or subheading, per California Rules of Court, rule 8.204(a)(1)(B), which requires each side to "[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority . . . ."

Nor does Roepel provide any argument with respect to her position. "Appellate briefs must provide argument and legal authority for the positions taken. 'When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived. [Citations.]'" (*Nelson v. Avondale Homeowners Assn.* (2009) 172 Cal.App.4th 857, 862 (*Nelson*).) "We are not bound to develop appellants' arguments for them. [Citation.] The absence of cogent legal argument or citation to authority allows this court to treat the contention as waived." (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830; see also *Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 366, fn. 2; *People v. Stanley* (1995) 10 Cal.4th 764, 793.) We therefore deem Roepel's argument regarding instructional error waived.

*C.* *The Trial Court's Evidentiary Rulings Do Not Support Reversal*

Roepel spends in excess of 47 pages detailing the testimony of each witness and bewailing the trial court's evidentiary rulings relating thereto. We review Roepel's contentions under an abuse of discretion standard. "'Broadly speaking, an appellate court reviews any ruling by a trial court as to the admissibility of evidence for abuse of discretion.' [Citation.] Even where evidence has been erroneously excluded, the

15

judgment or decision shall not be reversed unless the reviewing court is of the opinion that the error resulted in a miscarriage of justice. (Evid. Code, § 354; Cal. Const., art. VI, § 13.)" (*Beyda v. City of Los Angeles* (1998) 65 Cal.App.4th 511, 516.)

Here, aside from stating her contention and quoting the relevant legal standard in her opening brief, Roepel offers no analysis to support her argument. Even when she specifies rulings that were purportedly incorrect, she does not explain *why* they were incorrect or why they constituted prejudicial error, with citations to the law and cogent argument. We are "'not required to make an independent, unassisted study of the record in search of error or grounds to support the judgment.'" (*McComber v. Wells* (1999) 72 Cal.App.4th 512, 522.) A party's contentions must be supported by argument and citation to authority or we may deem them waived.

In all but three instances, Roepel fails to cite to any legal principle. Nor does she comply with California Rules of Court, rule 8.204(a)(1)(B). Therefore, without further analysis, we reject Roepel's claim of abuse of discretion. (*Landry v. Berryessa Union School District* (1995) 39 Cal.App.4th 691, 699-700.)[3]

---

[3] In a shotgun approach, Roepel contends the verdict was contrary to the law in that: (1) PSIC failed to send her either a "reservation of rights" letter or a "non-waiver" letter; (2) PSIC's rescission letter did not cite statutes favorable to Roepel; (3) PSIC failed to deliver the policy to Roepel; and (4) since the Leona Valley residence was visible to the public, under Insurance Code section 335, knowledge of Roepel's misstatements must be imputed to PSIC. We disagree. Even though we deem these arguments waived, we nevertheless find none of these legal positions to be persuasive, much less correct statements of law.

None of Roepel's other claims has merit. For example, Roepel contends the trial court erred by allowing evidence of: (1) Roepel's 1996 bankruptcy; (2) Roepel's 2001 Allstate theft claim (and argument that the 2005 personal property claim with PSIC is duplicative); and (3) Roepel's settlement with Freeway. Roepel's bankruptcy claim was relevant to establish a baseline for Roepel's personal assets as of 1996 (i.e., $500) and to attack Roepel's credibility for submitting to Allstate, in 2001, a $289,000 personal property loss claim (which was denied). Whether Roepel filed a duplicative property loss claim with PSIC in 2005 was similarly admissible as to her credibility and if PSIC failed to prove the 2005 claim was duplicative, such would inure to the benefit of Roepel. Finally, Roepel's settlement with Freeway was relevant to demonstrate Turton's bias.

16

First, Roepel contends the trial court erred by allowing PSIC to ask questions concerning a polygraph examination allegedly requested of Roepel. Although Roepel provides argument and legal authority for her position, she fails to cite specifically to the record, instead broadly citing pages 4920 through 5230 of the reporter's transcript. It is not this court's obligation to sift through several hundred pages of trial testimony to find the polygraph question (or questions) Roepel deems inappropriate. Regardless, even were we to agree with Roepel's contention, given (1) the length of this trial -- five weeks -- and the amount of evidence introduced, (2) the jury believed Roepel's testimony that she did not cause the arson to her property,[4] and (3) the evidence was overwhelming that Roepel's application contained material misrepresentations and Freeway was a broker, we find any alleged error did not result in a miscarriage of justice.

Second, Roepel complains the court erred in precluding her from using "judicial admissions" contained in PSIC's answer and cross-complaint. Roepel relies on *Fuentes v. Tucker* (1947) 31 Cal.2d 1, and *Razzano v. Kent* (1947) 78 Cal.App.2d 254, for the proposition that a party is bound by the admissions in his or her own pleadings. While we have no quarrel with the legal principle advanced, we disagree with Roepel that either the complaint or the cross-complaint contains judicial admissions. We therefore find no

---

Moreover, Roepel elicited the dollar amount of the settlement, not PSIC. Roepel cannot now on appeal claim error for information she elicited.

Simply put, in spite of the length of the trial and the mountain of evidence introduced, this case boils down to the following: (1) Freeway was Roepel's broker (overwhelming evidence supports this); (2) Roepel's application for insurance with PSIC contained numerous material misrepresentations (overwhelming evidence supports this); and (3) PSIC investigated Roepel's claim for 20 months, then denied it and rescinded her policy. Thus, the only real issue is whether 20 months is too long for an investigation, and if so, should one who otherwise would not qualify for a particular policy obtain over $500,000 in benefits because an investigation took too long? While we do not answer here how long is too long, we cannot say on these facts that 20 months is too long.

[4] The jury found that although the February 12, 2005 fires were intentionally set, Roepel was not the cause, either directly or indirectly.

17

abuse of discretion by the trial court in failing to deem any portion of either PSIC's complaint or cross-complaint a judicial admission.

Finally, Roepel appears to contend the court erred by preventing her from impeaching Lopez with a conviction "for driving without a license." Roepel, though, fails to identify the specific Vehicle Code section violated by Lopez (i.e., § 12500, 12951 or 14601, amongst others). Roepel also fails to provide any case law to substantiate her position that driving without a license is a crime of moral turpitude; nor are we aware of any such holding. Regardless, neither side called Lopez as a witness during trial. Therefore, impeaching her is not appropriate and we find that the trial court did not err.

### D.    *Prejudice*

Unless we conclude there is a reasonable probability that a result more favorable to appellants would have been reached in the absence of error, we must affirm the lower court's ruling. (*Soule v. General Motors Corp*. (1994) 8 Cal.4th 548, 574; *People v. Watson* (1956) 46 Cal.2d 818, 836.) A reasonable probability is one sufficient to undermine confidence in the outcome of the proceedings. (*Strickland v. Washington* (1984) 466 U.S. 668, 694; *In re Neely* (1993) 6 Cal.4th 901, 909.) Reasonable probability does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility. (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.) Here, the evidence in support of the jury's verdict is so compelling we find no reasonable probability a result more favorable to appellants would have been reached in the absence of any purported error, whether addressed herein or not.

## II.    Special Verdict

Roepel contends the trial court erred by approving a special verdict that required the jury to answer 38 interrogatories before Roepel would have any chance of recovery. We disagree.

We review Roepel's contention that the special verdict prejudiced appellants under an abuse of discretion standard. (*Red Mountain, LLC v. Fallbrook Public Utility Dist.*

18

(2006) 143 Cal.App.4th 333, 364.) Moreover, "[a] party who fails to object to a special verdict form ordinarily waives any objection to the form. [Citations.] However, waiver is not automatic, and there are many exceptions. [Citation.] For example, '[w]aiver is not found where the record indicates that the failure to object was not the result of a desire to reap a "technical advantage" or engage in a "litigious strategy." [Citations.]' [Citation.] Nor is an objection required when the verdict is fatally inconsistent." (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 530.)

Here, while there are 48 interrogatories in the special verdict (with damages starting at question No. 38), only the first 14 interrogatories were answered by the jury to reach its verdict. Moreover, the final language of the interrogatories was negotiated at length, both on and off the record. At no point on the record does Roepel formally object to the final version of the special verdict. Instead, Roepel cites generally to 51 pages of "horse-trading," during which Roepel fails to raise her current argument that either the number or order of the interrogatories prejudiced her. To the contrary, one can infer from the transcript Roepel was satisfied with the special verdict. Regardless, we find any error in the special verdict has been waived by Roepel's failure to object at trial.

### III. Demurrer

#### A. *Ruling on the Demurrer*

Roepel contends the trial court erred in sustaining PSIC's demurrer to the fraud, negligence and intentional infliction of emotional distress causes of action, and by not allowing leave to amend.

"'A demurrer tests the pleadings alone and not the evidence or other extrinsic matters. . . . The only issue involved in a demurrer hearing is whether the complaint, as it stands, unconnected with extraneous matters, states a cause of action.'" (*Hahn v. Mirda* (2007) 147 Cal.App.4th 740, 747, citations omitted.) We review the complaint de novo to determine whether it alleges facts sufficient to state a cause of action. For purposes of review, we accept as true all material facts alleged in the complaint, but not contentions,

19

deductions or conclusions of fact or law. We also consider matters that may be judicially noticed. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

**1.     Fraud**

According to Roepel, valid causes of action lie for both fraud in the inducement and fraud in the performance. The elements of fraud are: (1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to defraud or induce reliance; (4) justifiable reliance; and (5) damages. (See Civ. Code, §§ 1572, 1709, 1710.) Fraud actions are subject to strict requirements of particularity in pleading. (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 216.)

We need not address Roepel's contention regarding fraud in the inducement as it is moot in light of the jury's finding Freeway was a broker representing Roepel's interests, not an agent of PSIC. As such, PSIC cannot be held liable for any alleged misrepresentations made by Freeway. (*Krumme v. Mercury Ins. Co.* (2004) 123 Cal.App.4th 924, 929.)

With respect to fraud in the performance, while Roepel's complaint is exhaustive, it fails to sufficiently identify a false representation, concealment, or nondisclosure. Moreover, it fails to articulate justifiable reliance. Roepel's contention that had she known the true facts, she would have filed suit sooner does not constitute justifiable reliance, nor is it reasonable given that Debbie Ashmore, PSIC's Special Investigator Unit, repeatedly told Mike Vaughan, Roepel's public adjuster, PSIC had no intention of paying. Ashmore explained, "I'm not giving you a dime until the investigation is complete." As such, we affirm the trial court's ruling sustaining the demurrer to the fraud claim.

**2.     Negligence**

The elements of negligence are: (1) a duty the defendant owes to the plaintiff; (2) a breach of that duty by the defendant; (3) a causal connection between the breach and the plaintiff's injury; and (4) actual injury. (*Williams v. Beechnut Nutrition Corp.* (1986)

20

185 Cal.App.3d 135, 141; 4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 537, p. 624.)

The complaint alleges PSIC was "extremely negligent relative to the procurement of the subject insurance policy for various reasons." The complaint then lists seven specific breaches of duty purportedly committed by PSIC and Freeway. Again, given the jury found Freeway was acting as a broker and was therefore Roepel's agent, not PSIC's, none of the conduct alleged is actionable as against PSIC; PSIC had nothing to do with the procurement of the policy at issue. (*Rios v. Scottsdale Ins. Co.* (2004) 119 Cal.App.4th 1020, 1028-1029.) Nor can PSIC be held liable for any misrepresentation made by Freeway regarding coverage. (*Krumme v. Mercury Ins. Co.*, *supra,* 123 Cal.App.4th at p. 929.) Therefore, by virtue of the verdict, which we herein affirm, this issue is now moot and we need not address it.

### 3.    Intentional Infliction of Emotional Distress

The elements of intentional infliction of emotional distress are:  (1) outrageous conduct by the defendant; (2) intention to cause or reckless disregard of the probability of causing emotional distress; (3) severe emotional suffering; and (4) actual and proximate causation of the emotional distress.  Conduct is extreme and outrageous when it exceeds all bounds of decency usually tolerated by a decent society, and is of a nature which is especially calculated to cause, and does cause, mental distress.  Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions or other trivialities. (*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 617.)  Additionally, "California courts have held that delay or denial of insurance claims is not sufficiently outrageous to state a cause of action for intentional infliction of emotional distress." (*Coleman v. Republic Indemnity Ins. Co.* (2005) 132 Cal.App.4th 403, 416 (*Coleman*).)

Roepel fails to sufficiently allege any conduct that would fall within the parameters set forth in *Coleman*.  Therefore, we find the demurrer was properly sustained as to this cause of action.

21

*B.*     *Leave to Amend*

Roepel argues that even if the demurrer was properly sustained, she should have been granted leave to amend.

After a trial court sustains a demurrer without leave to amend, on appeal, the appellate court must decide whether there is a reasonable possibility the defect can be cured by amendment and, if so, whether the trial court abused its discretion, requiring reversal. (*Blank v. Kirwan, supra*, 39 Cal.3d at p. 318; *Hernandez v. City of Pomona* (1996) 49 Cal.App.4th 1492, 1497-1498; *Sanchez v. Truck Ins. Exchange* (1994) 21 Cal.App.4th 1778, 1781.) The plaintiff bears the burden of proving there is a reasonable possibility of amendment. (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43.) The appellate court will generally not decide an issue that has been rendered moot. (*Giles v. Horn* (2002) 100 Cal.App.4th 206, 227-228.)

We hold this issue has been rendered moot by the jury's finding PSIC had the legal right to rescind Roepel's policy based on material misrepresentations in her application for insurance, which again, we herein affirm. "A contract is extinguished by its rescission." (Civ. Code, § 1688.) "The consequence of rescission is not only the termination of further liability, but also the restoration of the parties to their former positions by requiring each to return whatever consideration has been received." (*Imperial Casualty & Indemnity Co. v. Sogomonian* (1988) 198 Cal.App.3d 169, 184 (*Imperial*), citing 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 869, p. 781.)

Here, as in *Imperial*, the policy would be extinguished *ab initio*, as though it had never existed. In other words, Roepel, as a matter of law, was never an insured under a policy of insurance. (*Imperial, supra,* 198 Cal.App.3d at p. 184.) Since she was never an insured, Roepel cannot now allege a valid cause of action for negligence, fraud or intentional infliction of emotional distress.

## IV.     Directed Verdict

Roepel contends the court erred in granting a directed verdict in favor of PSIC and against Roepel as to punitive damages.  We disagree.

A directed verdict against a plaintiff properly may be granted "'"only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, . . . indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given." [Citations.]  *Unless it can be said as a matter of law . . . no other reasonable conclusion is legally deductible* [*sic*] *from the evidence . . . the trial court is not justified in taking the case from the jury.' . . ."*  (*Hilliard v. A. H. Robins Co.* (1983) 148 Cal.App.3d 374, 395.) Substantial evidence is evidence that is of "'"ponderable legal significance,"' '"reasonable in nature, credible, and of solid value."'"  (*Howard, supra*, 72 Cal.App.4th at p. 631.)  The appellate court views the evidence in the light most favorable to the appellant and will reverse the judgment if substantial evidence exists to support a judgment for the appellant.  (*Colbaugh v. Hartline* (1994) 29 Cal.App.4th 1516, 1521.)

Here, Roepel provides 39 examples of malice, oppression or fraud, without a single reference to the record, in violation of "rule 8.204(a)(1)(C) of the California Rules of Court, with the consequence that such assertions will, at a minimum, be disregarded." (*Liberty National Enterprise, L.P. v. Chicago Title Insurance Co.* (2011) 194 Cal.App.4th 839, 846.)  Even were we to consider the 39 points, Roepel has failed to make a cogent argument as to why any or all of these points constitute(s) evidence of sufficient substantiality to support a verdict for punitive damages in her favor.  Nor do we so find.

Regardless, this issue is moot given the jury found against Roepel as to the only cause of action that might support an award of punitive damages (i.e., the first cause of action for breach of the implied covenant of good faith and fair dealing).  Therefore, there is no basis for an award of punitive damages.

## V. Nonsuit

The Children contend the court erred in granting a nonsuit in favor of PSIC and against the Children.

"A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor. [Citation.] 'In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give "to the plaintiff['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor."' [Citation.] A mere 'scintilla of evidence' does not create a conflict for the jury's resolution; 'there must be *substantial evidence* to create the necessary conflict.' [Citation.]" (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291.)

Here, the Children are not named insureds under the policy; their rights derive from Roepel. Again, since Roepel, under *Imperial*, was never an insured under a policy of insurance, neither were the Children. Thus, whether the nonsuit should have been granted as against the Children is moot and we need not address it.

## DISPOSITION

The judgment is affirmed. PSIC is awarded costs on appeal.

KARLAN, J.[*]

We concur:

FLIER, Acting P. J.                    GRIMES, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.